**Electronically Filed**
**Supreme Court**
**SCWC-23-0000013**
**20-SEP-2024**
**07:50 AM**
**Dkt. 21 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

OSCAR CARDONA,
Petitioner/Defendant-Appellant.

_____

SCWC-23-0000013

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-23-0000013; CASE NO. 1CPC-21-0000633)

SEPTEMBER 20, 2024

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, and DEVENS, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I. Introduction

This appeal of a murder conviction arises out of an altercation between strangers in Waikīkī after midnight on June 1, 2021. Elijah Horn ("Horn") was near Kuhio Beach with a group of four women he had just met. Two male visitors, decedent Elian Delacerda ("Delacerda") and Osvaldo Castaneda-Pena

("Castaneda-Pena") approached, friendly at first, but then started arguing with Horn and the women. Horn called his friend and roommate, Defendant Oscar K. Cardona, Jr. ("Cardona"), for help.

As Cardona arrived at the scene on his electric bicycle, the verbal argument escalated into a physical fight. Cardona pulled out a gold pocketknife. Castaneda-Pena struck Horn. Horn struck Castaneda-Pena back with his skateboard. One of the women also hit Castaneda-Pena with the skateboard.

Delacerda approached Cardona and punched him in the face. Cardona, who claimed to have extremely poor uncorrected vision, lost his glasses in the scuffle. He stabbed Delacerda several times. Delacerda died at the scene from a sharp force wound to his heart.

A jury convicted Cardona of murder in the second degree. Cardona appealed to the ICA alleging prosecutorial misconduct and instructional error. The ICA affirmed the conviction and sentence in a summary disposition order ("SDO").

Cardona's application for writ of certiorari presents the following questions:

> A. Did the Intermediate Court of Appeals ("ICA") gravely err in its Summary Disposition Order ("SDO") by relying upon facts not in evidence to rationalize and otherwise justify the DPA's improper conduct, and did the ICA gravely err in its SDO by analyzing the DPA's misconduct out of context?
>
> B. Did the ICA gravely err in its SDO by concluding that the DPA did not commit prosecutorial misconduct by offering

his personal opinions on witness credibility, and did the ICA gravely err in its SDO by concluding that the DPA did not commit prosecutorial misconduct by attacking Petitioner's credibility based on his defendant party status?

C. Did the ICA gravely err in its SDO by concluding that although the DPA's contumacious and repeated use of leading questions was "improper," the same was "harmless beyond a reasonable doubt" and by also concluding that "the DPA's remarks were either 'benign statements,' or 'reasonable inferences' that could be drawn from the record facts?"

D. Did the ICA gravely err in its SDO by concluding that the trial court did not commit reversible error by failing to provide a State v. Gabriel limiting instruction?

E. Did the ICA gravely err in its SDO by concluding the trial court did not commit reversible error by sua sponte providing the "Voluntary Act" jury instruction?

We hold that the DPA committed prosecutorial misconduct in his closing argument by improperly characterizing Cardona as a liar and a Waikiki "enforcer," which denied Cardona of his due process right to a fair trial under Article I, Section 5 of the Hawaiʻi Constitution. The misconduct was not harmless beyond a reasonable doubt. We therefore vacate the ICA's March 7, 2024 judgment on appeal, as well as the Circuit Court of the First Circuit's ("circuit court") December 13, 2022 judgment of conviction and sentence.[1] We remand this case to the circuit court for further proceedings consistent with this opinion.

---

[1] The Honorable Kevin T. Morikone presided.

3

## II. Background

### A. Circuit Court Proceedings

#### 1. Indictment

On June 4, 2021, Cardona was charged by indictment with one count of murder in the second degree, in violation of HRS §§ 707-710.5[2] and 706-656,[3] for intentionally or knowingly causing Delacerda's death.

#### 2.    Pretrial matters

##### a.    Notice of intent re eyesight evidence

Cardona filed a notice of intent to use evidence, indicating:

> 1. Both currently and at the time of the incident, Defendant OSCAR CARDONA suffers from an eye disease called myopic degeneration.
>
> 2. The result of this disease is that the Defendant suffers from extremely blurred vision, headaches and he requires thick glasses at all times in order to see.
>
> 3. Defendant has been a patient of Dr. David Young of Pediatric Ophthalmology of Hawaii since early childhood and Dr. Jon Portis of Sugiki Portis Eye Center as an adult.
>
> 4. During the incident, the Defendant's glasses were damaged when he was assaulted by either the decedent ELIAN DELACARDA and/or his friend OSVALDO CASTANEDA-PENA.
>
> 5. The glasses were collected and returned to the Defendant.

---

[2]    HRS § 707-710.5 is titled "Murder in the second degree" and defines the offense as "intentionally or knowingly caus[ing] the death of another person. . . ."  Murder in the second degree is a felony.  Id.

[3]    HRS § 706-656 is titled "Terms of imprisonment for first and second degree murder and attempted first and second degree murder."  Relevant to this appeal, a person over 18 years of age who is convicted of murder in the second degree "shall be sentenced to life imprisonment with possibility of parole."

4

6. The glasses were subsequently transferred from the Defendant to Public Defender investigator MATTHEW TINAY where they are being kept in a safe pending the trial.

7. The State is welcome to examine the glasses upon request.

At an August 17, 2022 pre-trial hearing, the circuit court ruled Cardona could testify about his poor eyesight. The circuit court also noted that the DPA was having difficulty securing the presence of Cardona's ophthalmologist for trial. The DPA expressed doubt as to whether Cardona was qualified to testify about his own eyesight because Cardona was not a doctor but acknowledged that Cardona's testimony could be weighed by the jury.

### b.    Gabriel instruction discussion

At the pretrial hearing, the DPA and defense counsel also discussed whether a limiting instruction (Gabriel instruction) should be given due to the State's plan to call Officer Cyrus Coen ("Coen") to identify Cardona. Officer Coen was able to identify Cardona on video recordings because he had cited Cardona for a COVID mask violation the year before. Defense counsel expressed concern that the jurors might think Officer Coen recognized Cardona "because he's a bad guy."

The court suggested providing a limiting instruction that Officer Coen's testimony would be considered for identification purposes only. Defense counsel expressed concern that a

limiting instruction could instead call more attention to Cardona's prior police contact.

The circuit court eventually ruled it would allow Officer Coen to testify as to Cardona's identity "based upon his prior familiarity with the defendant." Defense counsel said he did not think a limiting instruction would be necessary, but the circuit court said it would give one in an abundance of caution.[4] No limiting instruction ended up being given.

### 3. Jury Trial

Cardona's jury trial began on August 25, 2022. At issue was whether Cardona stabbed Delacerda in self-defense or involuntarily. The State presented many witnesses. Only

---

[4]  It appears the circuit court was considering a Gabriel instruction:

> You have heard evidence that the defendant . . . at another time may have had a prior contact or interaction with a Honolulu Police Department officer. The evidence, if believed by you, may be considered only on the issue of the defendant's identity as the person who committed the offense charged. Do not consider the evidence for any other purpose. You must not use this evidence to conclude because the defendant, at another time, may have had prior interactions or contacts with the Honolulu Police Department officer that he is a person of bad character and, therefore, must have committed the offense charged in this case. You must not draw any adverse inference against [the defendant] from the fact that the witness is a law enforcement officer. In considering the evidence for the limited purpose for which it has been received or will be received, you must weigh it in the same manner as you would all other evidence in the case and consider it along with all other evidence in this case. If believed, you may give the evidence such weight as you feel it deserves but only for the limited purpose that I described to you.

State v. Gabriel, 2022 WL 1284613 at *11 (Haw. App. Apr. 29, 2022).

Cardona testified for the defense and his credibility was central to his defense.

Salient testimony included the following.

### a. Testimony of Elijah Horn

Horn was Cardona's roommate. Horn had met a few women the night before and, shortly after midnight on June 1, 2021, they were gathered at the tables near Kuhio Beach. Delacerda and Castaneda-Pena approached and asked if they wanted a shot. Horn said yes, but Delacerda and Castaneda-Pena then became vulgar and aggressive, calling Horn the N-word. The women verbally defended Horn, so Delacerda and Castaneda-Pena started calling them "stupid cunts" and the "B word." Horn did not walk away because he did not want to look like a "pip-squeak."

Instead, Horn called Cardona because he was scared and Cardona was like a father figure to him. When Cardona arrived, Cardona pulled out a gold knife that Horn had never seen before. He thought Cardona was just going to use it to scare off Delacerda and Castaneda-Pena. Cardona and Horn told Delacerda and Castaneda-Pena to leave because they did not want to fight with them.

Delacerda then slapped Horn. Then Castaneda-Pena rushed toward Horn and hit him in the face, so Horn engaged with Castaneda-Pena. Horn hit Castaneda-Pena with his skateboard.

Horn ended up on the ground and one of the women hit Castaneda-Pena with the skateboard.

Horn did not know what happened between Delacerda and Cardona.  When he and Castaneda-Pena disengaged, Horn saw Delacerda lying on the ground with a woman kneeling beside him yelling for help.  Horn then helped Cardona find his glasses because, without them, Cardona "couldn't see" and was "in complete . . . panic mode."

Horn then returned to the hotel room, where Cardona was showering.  Cardona's face looked beaten up and bloodied.  There were bloody towels in their bathroom.  Cardona told Horn to "lay low."  Cardona said he thought he had stabbed Delacerda three times in the stomach.  Cardona told Horn he was going to throw out the gold knife.  (He ended up not doing so.)

According to Horn, although Cardona seemed like a "hard guy" and "not . . . the type of person that you would see like as a pushover," Cardona was "not a fighter" and he had "[n]ever seen him fight before."  Cardona was physically strong and the two used to arm-wrestle and spar, but he had never known Cardona to be violent.  In fact, he had never seen Cardona raise his voice in anger at anyone.

There were numerous instances during Horn's testimony when the DPA asked improper leading questions resulting in sustained

objections, striking of testimony and/or cautionary instructions from the circuit court.

### b.   Testimony of Osvaldo Castaneda-Pena

Castaneda-Pena and Delacerda were visiting Hawai'i from Vacaville, California.  The night before, they had been drinking at their hotel pool and decided to go down to Waikīkī Beach. Castaneda-Pena did not recall how the altercation started and did not see what happened between Cardona and Delacerda.

### c.   Testimony of Melissa Del Sarto

Melissa Del Sarto ("Del Sarto"), a registered nurse from a Chicago suburb, was visiting Hawai'i.  Del Sarto and two others were on Kuhio Beach when she heard a commotion "like a fight breaking out on the walkway area."  She saw four men fighting, two on two.  She saw one man hit another in the head or body with a skateboard.  She saw the other two men facing each other, then one "just kind of slowly went to the ground," "fell on his butt and slumped over," until he was "laying in the grass."  The crowd ran away until only "the victim and the victim's friend" remained.

Del Sarto ran up to the victim and started performing CPR, but she knew he was dying because of his "agonal breathing," which she explained as the body's "last-ditch effort to try and oxygenate" itself.  She stopped her efforts after police and EMS showed up and asked her to step aside.

### d.  Testimony of Arkadiy Plekhanov

Arkadiy Plekhanov ("Plekhanov") was near the scene when he heard an argument and decided to record it on Facebook Live. When he saw someone hit someone else, he stopped recording and walked away to call 911 to summon police.  While he was still on the 911 call, he saw a body lying on the ground and asked for an ambulance as well.  He then started recording again. Plekhanov's recording did not capture the moments Delacerda was stabbed.

### e.  Testimony of Phillip Montoya

Phillip Montoya ("Montoya") was a visitor from California staying at the Marriott Waikiki.  While he was relaxing on the lanai of his 23rd floor hotel room, his attention was drawn to a "scuffle on the beach."  With his cell phone, he started recording a group of about ten people gathered at Waikīkī Beach. When he saw police arrive and put up yellow caution tape, he realized something serious had happened and called the police to let them know he had recorded the incident.  Montoya's recording also did not capture the moment Delacerda was stabbed because Montoya had started looking around and his phone camera's viewfinder drifted to the right of the scene.

### f.  Testimony of Cheyne Kaninau

HPD officer Cheyne Kaninau was dispatched to the fight scene.  When he arrived, he saw a woman performing CPR on an

unresponsive person lying on the ground. He told the woman to stop because he could see the person breathing.

### g. Testimony of Jon Kurosu

Jon Kurosu ("Kurosu"), an EMS paramedic, responded to the incident. Delacerda had no pulse and was not breathing when he arrived. Delacerda appeared to have stab wounds to the chest, armpit, and the back of his left shoulder. Kurosu testified that CPR should not be performed on someone who is still breathing and still has a pulse.

### h. Testimony of Star Sutherland

Cardona's friend, Star Sutherland ("Sutherland"), read to the jury some text message exchanges between her and Cardona. Between 1:37 to 1:45 am on June 1, 2021, were the following messages:

> Cardona: Hey how are you? Hope you're doing well
>
> Cardona: Can I call you? I need to talk to you about something major.
>
> Sutherland: Ya what
>
> Sutherland: Call

Cardona called Sutherland at 1:47 am, and the call lasted five minutes. Cardona told her he had been in a fight and he "did not sound okay." Cardona told her he stabbed somebody, but Sutherland did not believe him, stating, "[I]t's completely not something that I would expect from him."

11

The text messaging then resumed at 8:34 am with the following exchange, after Sutherland had seen posts about two Waikīīkī stabbings on social media:

       Sutherland: How are you?

       Cardona:     Good

       Sutherland: Ok good.  Have you seen the news?

       Cardona:     No
       Cardona:     Have you?

       Sutherland: Yes!

       Cardona:     What happened?

       Sutherland: There was two stabbings in Waikiki last night, one guy in critical & one dead
       Sutherland: They arrested a 29 year old guy

       Cardona:     Oh fuck
       Cardona:     I'm a dead man

       Sutherland: The guy that was in a fight and got stabbed is dead & they haven't arrested anyone yet
       Sutherland: The other guy that got stabbed was following a couple and then stabbed the boyfriend

       Cardona:     Really

       Sutherland: That guy is in critical and they arrested a 29-year old in that case

       Cardona:     Can you show me the news

       Sutherland: So weird both happened like a block from each other 20 minutes apart
       Sutherland: Yes
       Sutherland: [sending three attachments from news outlets]
       Sutherland: Fuck
       Sutherland: [sending two more attachments from news outlets]

At 10:49 am, Sutherland texted Cardona asking, "Is that the fight you got in?  You ok?"  Sutherland told Cardona to turn himself in.

During direct examination, the following exchange also took place:

> DPA: But you told the detective that he carried a gold knife, correct?
>
> Sutherland: I said that he carried a knife, yeah, like most -- yes, yes I did.
>
> DPA: No, I meant -- what I was going to say was --
>
> Defense Counsel: Objection --
>
> Sutherland: -- most everybody that I know --
>
> Defense Counsel: -- leading.
>
> The Court: Sustained. Court's going to strike that last response.

On cross-examination, Sutherland testified that Cardona sounded "scared," "upset," and "distraught" during their phone call and that she "couldn't tell if he was crying." She worried that he was suffering from a concussion.

### i. Testimony of Cyrus Coen

HPD Crime Reduction Unit Officer Cyrus Coen participated in the murder investigation. He went to Ohia Waikiki Suites, where Cardona and Horn lived, and reviewed surveillance videos. Officer Coen recognized Cardona on those videos. When Cardona returned to the hotel at around 6:00 pm on June 1, 2021, Officer Coen arrested him.

On cross-examination, the following exchange took place regarding how Officer Coen recognized Cardona:

> Defense counsel: I think you testified that you watched the video and you recognized Oscar Cardona.
>
> Officer Coen: Yes.

13

> Defense counsel:  And, in fact, you gave him a -- a COVID ticket on September 1st, 2020?
>
> Officer Coen:  No, I believe it was March 4, 2021.
>
> Defense counsel:  Excuse me.  I have one here.  It says date of issuance, September 1st, 2020.  Might have been two times.  But would you like to take a look at this?
>
> Officer Coen:  Sure.
>
> Defense counsel:  Well, in any event, you recall giving him a COVID ticket, correct?
>
> Officer Coen:  Yes.
>
> Defense counsel:  And a COVID ticket, basically he wasn't wearing a mask, right?
>
> Officer Coen:  Yes.

### j.   Testimony of Charles Rezentes

HPD detective Charles Rezentes ("Rezentes") also reviewed the Ohia Waikiki Suites surveillance videos, which showed Horn and Cardona coming and going from the evening of May 31, 2021 through the morning of June 1, 2021.  Rezentes did not testify that he recognized Cardona from prior contacts.

### k.   Testimony of Veronica De Mello

HPD evidence specialist Veronica De Mello went to Cardona's residence to help execute a search warrant.  She collected evidence that included a towel, bed cover, and shorts, all with blood-like substances on them, as well as a knife and a necklace.

### l.  Testimony of Shannon Klum

HPD criminalist Shannon Klum testified as an expert in serology and forensic DNA testing.  Cardona's DNA was found in blood samples taken from the sidewalk at the scene and on a gold chain.  Delacerda's DNA was found in blood samples taken from the sidewalk at the scene and on the knife.  A mixture of two sets of DNA was found on the knife; Castaneda-Pena and Horn were ruled out as sources.  One blood stain on Cardona's shirt contained DNA matching Cardona's profile, and another blood stain on the shirt contained a mixture of DNA, for which Cardona and Delacerda could not be ruled out as possible sources.  Blood on Cardona's shorts matched the DNA profiles for Delacerda and Cardona.  She also could not exclude Cardona as a possible contributor to the DNA found on a blood sample taken from the surface of Delacerda's left hand.

### m.  Testimony of Masahiko Kobayashi

Dr. Masahiko Kobayashi, the chief medical examiner for the City and County of Honolulu, who performed Delacerda's autopsy, testified as an expert in forensic pathology.  There were five sharp-force injuries on Delacerda: a shallow and small wound to the head; an inch-long wound to the chest that was between one and two inches deep that had "hit the heart"; an inch-long and inch-deep cut to the left side of the body that penetrated only muscle tissue; a "tiny" one-fourth inch wound to the back of the

15

right upper arm; and a one-inch entry cut on the shoulder, where a weapon had exited through a small hole on the other side. Delacerda's cause of death was "stab wound of the chest," specifically from the wound that had penetrated his heart.

Also, Delacerda's blood alcohol content was 0.245 grams per deciliter.

### n.  Testimony of Hideko Yoshihara

HPD evidence specialist Hideko Yoshihara was present at the morgue when Dr. Kobayashi performed the autopsy.  She photographed the injuries on Delacerda's chest, left side, back of the right arm, and left shoulder, as well as possible injuries to his forehead and left ear.  She also processed Cardona on June 3, 2021 and photographed a possible injury to the top side of his left hand.

### o.  Testimony of Kathy Gunderson

Kathy Gunderson was the general manager of the Ohia Waikiki Suites, where Cardona resided (with Horn and two other men) from March to June 2021.  During the three months Cardona lived at the hotel, he paid his bills, did not cause any problems, and was a good guest.

### p.  Testimony of Oscar K. Cardona, Jr.

The defense's only witness was Cardona.  He was 21 years old on the night of June 1, 2021.  He grew up in Waikīkī and had lived there his entire life.  He is the only child of a mother

originally from Nagano, Japan.  As a single mother, she worked every day, sometimes both day and night shifts, as a jewelry salesperson in Waikīkī.  He had never met or communicated with his father, who lives in Mexico.  He spent much of his younger years with caregivers in Kaimukī while his mother worked, because she considered Waikīkī too dangerous.  Cardona liked to spend time at home playing Pokemon Go and later played clarinet in the Saint Louis School band.

Cardona's eyesight had been poor since he was four years old.  He began seeing an eye specialist at that time, who prescribed new glasses every six months because his vision deteriorated at a rapid pace.  When he takes off his glasses, "everything is blurry, and the only thing I can see is figures."  Without his glasses, he can clearly see objects only when they are a few inches away from his face.  It would not be safe for him to ride a bike, walk around outside, or do any kind of ocean activity, like swimming, without his glasses.  His vision is even worse at night.

As to the incident, Cardona had been riding his bike around Waikīkī when Horn called asking for help.  When Cardona arrived at Horn's location, he saw two guys and a bunch of girls arguing with each other.  He parked his bike and took out a knife "just in case" something were to happen.  He had never been in a fight before.  Delacerda was "angry and aggressive," "swearing, saying

17

the N word, the B word, the C word, the H word," and had an overall "scary" demeanor.  Horn and Cardona asked Delacerda and Castaneda-Pena to leave.  While Cardona was trying to "defuse" the situation, the girls were arguing back.

Cardona saw Castaneda-Pena pick something up from the ground but Cardona could not tell what it was.  At that point, Cardona was worried that the object was a weapon, so he had his knife in his hand.  He saw Castaneda-Pena stumble, and the girls were laughing at him.  Delacerda then got upset and jumped off a low wall and slapped Horn.

Castaneda-Pena then punched Cardona in the face.  Cardona had never before been punched in the face.  His glasses broke and fell to the ground.  He could not see and could not run away.  Everything was "blurry and dark" and he felt scared and vulnerable.

Someone started attacking him so he "tried to fight back, but it was very hard . . . to see what was going on."  No one came to help him.  At some point, his attacker stopped without saying anything.  Cardona then stood in place trying to find his glasses.  Horn found Cardona's glasses for him.  Cardona did not know if he himself had been injured.  Cardona also testified he had held his knife out and that it was possible Delacerda had run up against it and stabbed himself.

When Cardona returned to his hotel room, he was in pain, bleeding, and scared. He reached out to Sutherland. When he found out later what had happened, he was in shock and could not process the night's events. He did not throw the gold knife away and instead placed it in his room safe and went to work. He did not intend to kill Delacerda; he was only trying to protect himself.

On cross-examination, the DPA and Cardona entered into the following exchange concerning the moment Cardona used his knife:

> DPA:  So when you stabbed him, how were you stabbing him? You got a pen over there? I don't want to give you the knife.
>
> Cardona:  No.
>
> DPA:  You want a pen? I guess I'll give you my pen. Use that as the knife. Show us how -- how were you stabbing Elian Delacerda?
>
> Cardona:  I wasn't stabbing him. I was just protecting myself.
>
> DPA:  Wait, wait, wait, wait. Did you go like that? (demonstrates.)
>
> Cardona: No.
>
> DPA:  So you were holding it.
>
> Cardona:  Yeah, I was just holding it.
>
> DPA:  So you never stabbed at him?
>
> Cardona:  No.
>
> DPA:  So when you told Elijah Horn you stabbed him three times in the stomach, that wasn't true?
>
> Cardona:  I didn't tell him that.
>
> DPA: He made that up?
>
> Cardona:  I said I thought I probably did.

19

DPA:  Okay.  Well, are you saying he walked into the knife?  You was just holding it like that (demonstrates), and he walked into the knife?

Cardona:  Well, I didn't say that either.

DPA:  Okay.  So you were defending yourself, so you had to at least give him one?  (Demonstrates)

Cardona:  No.

DPA: No?

Cardona: No.

DPA: You never gave him any strikes?

Cardona: No.

DPA:  You don't know how he got all those injuries?

Cardona:  Well, he was attacking me, so probably when he was attacking me.

DPA:  So he was attacking you, so you were stabbing him?

Cardona: No, I didn't stab him.

DPA: So you never stabbed him with this knife?

Cardona: No.

DPA:  Okay.  So you don't know how his blood, his DNA, got on the blade of this knife?

Cardona:  Well, he came attacking me, so maybe he did it to himself.

DPA:  Oh, so he stabbed himself?

Cardona:  He probably ran into it.

DPA:  He ran into it?

Cardona:  Yeah.

DPA:  Okay.  So tell us how you were holding the knife.  Show us.

Cardona:  I was just holding it out.

DPA:  We want to see you.

Cardona:  I was just holding it out.

DPA:  Stand up, please.  Stand up.  Stand up.

Cardona:  Okay.

DPA:  Show us how you were holding the knife.

Cardona:  Like this.  (Demonstrates.)

DPA:  Okay.  So you was holding the knife like this.
      (Demonstrates.)  And then what?  You weren't moving
      your arms?

Cardona:  Well, he -- when he came at me, of course my arms
      would move.

DPA:  Okay.  So show us what you did.

Cardona:  I don't know what I did.  He was coming at me.
      It's just a reaction, that he's coming at me.

DPA:  So you had to stab him; right?

Cardona:  No.

DPA:  How did it get -- how did he get that stab wound in
      his heart?

Cardona:  I . . . .

DPA:  How?

Defense counsel:  Asked and answered.  He says he doesn't
know.

The Court:  Sustained.  Court's going to sustain the
objection.

## 4.  Voluntary act jury instruction

During the settling of jury instructions, the State asked

the court to give Hawai'i Standard Jury Instructions Criminal

(HAWJIC) instruction 7.16 on "Voluntary Act or Voluntary

Omission."  That instruction read as follows:

> In any prosecution[] it is a defense that the conduct
> alleged in the charged offense does not include a voluntary
> act [or the voluntary omission to perform an act of which
> the Defendant is physically capable].  A "voluntary act"
> means a bodily movement performed consciously or habitually
> as the result of effort or determination of the Defendant.
> The burden is upon the prosecution to prove beyond a
> reasonable doubt that the Defendant's conduct as to the
> (specify offense) charge included a voluntary act [or the
> voluntary omission to perform an act of which the Defendant

21

> is physically capable]. If the prosecution fails to meet its burden, then you must find the Defendant not guilty of the charge.

HAWJIC 7.16 (eff. March 1, 2021).

The DPA noted that there was "a scintilla of evidence" to support requiring the instruction because Cardona had testified he just held the knife out and that it was possible that Delacerda ran into it and stabbed himself. Defense counsel objected on the grounds he did not think there was a basis in the evidence to give the instruction based on his recall of Cardona's testimony. The circuit court indicated the existence of a scintilla of evidence, requiring the court to give the instruction, citing State v. Adviento. See 132 Hawai'i 123, 137-38, 319 P.3d 1131, 1145-46 (2014) (noting our cases holding that it is a judge's obligation to properly instruct the jury and requiring an extreme mental or emotional disturbance ("EMED") instruction when the record reflects any evidence that the defendant acted under a loss of self-control resulting from EMED). It gave HAWJIC instruction 7.16 over defense objection.

### 5. Closing arguments

The DPA's closing argument included the following:

> "The prosecution is required to prove causation. Causation has a special meaning under the law. To prove causation, the State must prove two components beyond a reasonable doubt."
> "In the first component, the State must prove that the defendant's conduct is an antecedent but for which the result in question would not have occurred." What does that all mean? Oh, my goodness. Then it says, "In other words, without defendant's actions, the result would not

have happened." If he didn't pull out that knife, if he didn't stab Elian Delacerda, the result would not have happened.

During his rebuttal closing argument, the DPA's stated:

> People lie. The evidence doesn't lie. You have these photographs [of the cones where DNA swabs were taken at the scene of the incident].

(Emphasis added.)

> [Cardona] wasn't scared. That's why we put those videos in there [of Cardona riding his electric bicycle around Waikiki before and after the incident], because when everybody comes to court, they're on their best behavior. But you look at those videos. He's riding around Waikiki. He's on his bike. (Gestures.) For 14 minutes. Some big guys walk past him. He ain't no -- he ain't no puppy with his tail between his legs. He knows those streets in and out of Waikiki.
> These girls that Horn said needed to be protected? I wouldn't want to run into them. They looked like the Waikiki wrecking crew. They beat up on those guys, because they were drunk. They're too drunk to defend themselves, falling, stumbling.

> . . . .

> Defendant said, well, when I don't wear my glasses, I'm blurry. He didn't say he was color blind. Guy was wearing a red hat, black shirt, red shorts. You take off your glasses, you get up close to somebody, maybe you might see, but you see a figure.

> . . . .

> [T]hat's how [Cardona] was on those streets. He looked like he owned those streets, riding his bike all over, sometimes with the light on, sometimes with the light off, going up the one way, going against -- going against traffic, riding on the sidewalk, whatever, doing whatever he wants. He's scared? He looks like the enforcer.

> . . . .

> The defendant would have you believe that an unarmed man ran into his knife. That's not self-defense. He's saying self-defense. What he said on the stand, that ain't self-defense. He said, I was holding the knife. I don't know what happened. He's attacking me. I don't know. Come on. He's holding the knife like that? (Demonstrates.) Come on. Be truthful. He knows exactly what happened. He's playing that thing over and over in his mind.

. . . .

> [R]emember, there's no credible evidence that he
> can't see.  There's no credible, independent evidence that
> he had an eye problem.

At one point during closing arguments, the DPA's glasses started fogging up, and he made a comment about it to the jury ("Sorry.  My glasses are fogging up here.  I got to see.")

**6.  Verdict, conviction, sentencing, and notice of appeal**

The jury found Cardona guilty as charged of the offense of murder in the second degree.  The circuit court entered its judgment of conviction and sentence on December 13, 2022, sentencing Cardona to life imprisonment with the possibility of parole.  On January 30, 2023, Cardona filed a notice of appeal.

**B. ICA Proceedings**

Cardona raised the following points of error:

> A.  The DPA committed misconduct throughout the proceedings
> that violated Cardona's constitutional right to a fair
> trial by offering his personal opinions about witness
> credibility, including an attack on Cardona's credibility
> solely based on party status.
> . . . .
> B.  The DPA committed misconduct throughout the proceedings
> that violated Cardona's constitutional right to a fair
> trial by testifying as a witness in his own case, and by
> asking excessive leading questions.
> . . . .
> C.  The Circuit Court plainly erred when it did not provide
> a State v. Gabriel limiting instruction in response to
> Rezentes's, and Coen's, Police Identification of Cardona
> from video evidence.
> . . . .
> D.  The Circuit Court plainly erred when it provided the
> "Voluntary Act" instruction.

The ICA affirmed the circuit court in a February 6, 2024 SDO.  State v. Cardona, No. CAAP-23-0000013, 2024 WL 450038

24

(Haw. App. Feb. 6, 2024) (SDO). The ICA characterized as "either benign statements, or reasonable inferences that could be drawn from the record facts" (1) the DPA's statement about Cardona's poor eyesight, (2) the "Waikiki wrecking crew" comment, (3) the DPA's use of a pen rather than a knife during Cardona's testimony, and (4) his "general statement" that "People lie," which was "not specifically directed at Cardona." Cardona, 2024 WL 450038, at *2. The ICA footnoted that the DPA's statement about his glasses fogging up were due to the fact that the DPA "was wearing a face mask, consistent with the court's COVID protocol. . . ." Cardona, 2024 WL 450038, at *1 n.3.

The ICA then concluded that "the DPA's repeated use of leading questions throughout trial was harmless beyond a reasonable doubt," because defense counsel objected, the circuit court sustained the objection and struck witness testimony where warranted, and the circuit court directed the DPA to ask open-ended questions. Cardona, 2024 WL 450038, at *2. Nevertheless, the ICA footnoted its concern that "the DPA's repeated asking of leading questions, in spite of the circuit court's directions to the contrary, does not promote a positive image of the legal profession, does not assist the court and/or the jury in reviewing the case, and does not display appropriate respect for

the criminal justice system." Cardona, 2024 WL 450038, at *2 n.4.

As to whether the circuit court plainly erred in failing to give the jury a Gabriel instruction, the ICA stated, "On this record, we conclude that the lack of a limiting instruction, regarding the testifying officers' identification of Cardona from video evidence, was not prejudicially insufficient, erroneous, inconsistent, or misleading." Cardona, 2024 WL 450038, at *2. The ICA also concluded the "voluntary act" instruction was properly given because it "informed the jury of a potential defense available to Cardona." Id.

The ICA issued its judgment on appeal on March 7, 2024.

## C. Certiorari proceedings

On certiorari Cardona presents the following questions:

> A. Did the Intermediate Court of Appeals ("ICA") gravely err in its Summary Disposition Order ("SDO") by relying upon facts not in evidence to rationalize and otherwise justify the DPA's improper conduct, and did the ICA gravely err in its SDO by analyzing the DPA's misconduct out of context?
>
> B. Did the ICA gravely err in its SDO by concluding that the DPA did not commit prosecutorial misconduct by offering his personal opinions on witness credibility, and did the ICA gravely err in its SDO by concluding that the DPA did not commit prosecutorial misconduct by attacking Petitioner's credibility based on his defendant party status?
>
> C. Did the ICA gravely err in its SDO by concluding that although the DPA's contumacious and repeated use of leading questions was "improper," the same was "harmless beyond a reasonable doubt" and by also concluding that "the DPA's remarks were either 'benign statements,' or 'reasonable inferences' that could be drawn from the record facts?"

26

D.  Did the ICA gravely err in its SDO by concluding that the trial court did not commit reversible error by failing to provide a State v. Gabriel limiting instruction?

E.  Did the ICA gravely err in its SDO by concluding the trial court did not commit reversible error by sua sponte providing the "Voluntary Act" jury instruction?

In addition to his arguments below, Cardona argues that the ICA relied upon facts not in evidence to conclude that the DPA's comments about eyesight were harmless; specifically, Cardona points to the ICA's notation that the DPA was wearing a face mask due to court COVID protocols.

### III. Standard of Review: Prosecutorial Misconduct

> Because prosecutorial misconduct impacts the fundamental right to a fair trial, there is no difference between the plain error and harmless beyond a reasonable doubt standards of review.
>
> In prosecutorial misconduct cases, then, once the defense establishes misconduct -- objection or no objection -- appellate review is the same: "After considering the nature of the prosecuting attorney's conduct, promptness or lack of a curative instruction, and strength or weakness of the evidence against the defendant, a reviewing court will vacate a conviction if there is a reasonable possibility that the conduct might have affected the trial's outcome.

State v. Hirata, 152 Hawai'i 27, 31, 520 P.3d 225, 229 (2022) (citation omitted).

### IV. Discussion

**A.  The ICA did not rely on facts outside of the evidence in its SDO but did err by analyzing some of the DPA's misconduct out of context**

In his first question on certiorari, Cardona initially argues that the ICA relied upon facts not in evidence to conclude the DPA's comments about eyesight were harmless.  The DPA had stated during closing arguments, "Sorry.  My glasses are

27

fogging up here. I got to see." Specifically, Cardona points to the ICA's footnote stating that the DPA was wearing a face mask due to court COVID protocols, which he asserts was a fact not in evidence. See Cardona, 2024 WL 450038, at *1 n.3.

The DPA's statements about his glasses fogging up were indeed due to mask use during trial. During jury selection, the circuit court told the jury, "Everyone's required to wear a face mask in the courthouse." It was not error for the ICA to take judicial notice of court mask protocols in place at that time. Hawai'i Rules of Evidence Rule 201, Judicial notice of adjudicative facts. Also, although Cardona links the "I got to see" comment to the DPA's other comments about Cardona's eyesight, the first comment was not related or close in time to the DPA's other comments about Cardona's eyesight.

Cardona also asserts that the ICA erred by analyzing some of the DPA's misconduct out of context. With respect to the "Waikiki wrecking crew" comment, the ICA did not err by ruling it was made "in reference to other individuals that Cardona was with during the night of the incident." Cardona, 2024 WL 450038, at *1. Read in context, it is clear the DPA was referring to the women Horn met, one of whom had hit Castaneda-Pena with a skateboard, and not to Cardona:

> These girls that Horn said needed to be protected? I
> wouldn't want to run into them. They looked like the
> Waikiki wrecking crew. They beat up on those guys, because

28

they were drunk.  They're too drunk to defend themselves, falling, stumbling.

Further, the ICA did not err with respect to the DPA's comment that he did not want to give Cardona a knife to demonstrate what happened.  See Cardona, 2024 WL 450038, at *1.  Realistically, a knife would not be used in a courtroom reenactment.  The DPA should have chosen his words more carefully as a written transcript cannot reveal a statement's tone.  We have no doubt that the circuit court would have stepped in if the DPA was suggesting something sinister or prejudicial, rather than attempting to lighten the mood.

As discussed in Section IV.B below, however, the ICA did err in its analysis of the DPA's statements in closing argument (1) that "People lie" and to "Be truthful"; (2) characterizing Cardona as an "enforcer"; and (3) in inserting his personal opinion and new evidence concerning Cardona's eyesight.  See Cardona, 2024 WL 450038, at **1-2.

**B.    The DPA committed prosecutorial misconduct**

In his second question on certiorari, Cardona asserts the ICA erred in not finding prosecutorial misconduct.

**1.    Definition of prosecutorial misconduct**

"Prosecutorial misconduct" is a legal term of art referring to any improper action committed by a prosecutor, however harmless or unintentional.  State v. Borge, 152 Hawai'i 458, 464, 526 P.3d 435, 441 (2023) (cleaned up).  It does not matter that

29

defense counsel objected to some but not all of the comments. "In prosecutorial misconduct cases, . . . once the defense establishes misconduct -- objection or no objection -- appellate review is the same: After considering the nature of the prosecuting attorney's conduct, promptness or lack of a curative instruction, and strength or weakness of the evidence against defendant, a reviewing court will vacate a conviction if there is a reasonable possibility that the conduct might have affected the trial's outcome."  Hirata, 153 Hawai'i at 31, 520 P.3d at 229 (citation omitted).  Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial.  State v. Austin, 143 Hawai'i 18, 39, 422 P.3d 18, 39 (2018).

2. **Some of the DPA's statements constituted prosecutorial misconduct**

a. **"People lie" and "Come on.  Be truthful"**

It was prosecutorial misconduct for the DPA, in closing argument, to characterize Cardona as a liar with his "People lie" and "Come on.  Be truthful" comments:

> People lie.  The evidence doesn't lie.  You have these photographs [of the cones where DNA swabs were taken at the scene of the incident].
>
> . . . .
>
> The defendant would have you believe that an unarmed man ran into his knife.  That's not self-defense.  He's saying self-defense.  What he said on the stand, that ain't self-defense.  He said, I was holding the knife.  I don't know

30

> what happened.  He's attacking me.  I don't know.  Come on.
> He's holding the knife like that?  (Demonstrates.)  Come
> on.  Be truthful.  He knows exactly what happened.  He's
> playing that thing over and over in his mind.
>
> . . . .
>
> [R]emember, there's no credible evidence that he can't see.
> There's no credible, independent evidence that he had an
> eye problem.

The ICA ruled that the "people lie" statement was not specifically directed at Cardona.  In the context of the DPA's closing argument, however, including the later statements quoted above, "Come on.  Be truthful," it is clear the only material testimony the DPA sought to discredit was that of Cardona.  In Austin, we held that a prosecutor's assertion that a defendant or witness lied to the jury is improper and should not be permitted. 143 Hawai'i at 56, 422 P.3d at 56.[5]  We also

---

[5]     Austin points out that courts across the country have recognized that the word "lie" and its derivatives may inject unfair prejudice when utilized by the prosecution.  143 Hawai'i at 50-51, 422 P.3d at 50-51.  It also provides a detailed explanation of the myriad reasons why it is improper for a prosecutor to use the word "lie" or its derivatives in reference to any witness, and much more so regarding a defendant, including (1) it carrying severe negative associations beyond a simple expression of factual inaccuracy and denoting an intentional, wrongful act to actively deceive a listener; (2) its strongly pejorative tone conveying subjective disapproval that the witness would taint the judicial process with dishonesty; (3) amounting to an assertion of the prosecutor's personal opinion as to the dishonest character of the testifier; (4) an invasion of the province of the jury, usurping its power to make credibility determinations; (5) the special weight given by juries to a prosecutor's arguments because of the fact-finding facilities presumably available to the office; (6) the prosecutor's opinion carrying with it the imprimatur of the government, especially with the high respect for integrity, fairness, and impartiality accorded to the office; (7) the inflammatory nature of the accusation with the reprehensible nature of lying deeply ingrained in most people from childhood; (8) the emotional reaction likely to be experienced by a juror when authoritatively told the juror has been lied to; (9) the actual immateriality of the term, as the ultimate concern of jurors is not whether a witness knows testimony to be false; (10) the possibility that the lie will be viewed as a separate wrongful act, which has the dangerous potential of swaying the jury from its duty to determine guilt regarding the charged offense; (11) ultimately creating the

explained that such statements are functionally equivalent to the prosecutor expressing a personal opinion as to the veracity of a witness.  143 Hawai'i at 51, 422 P.3d at 51.

With respect to the "People lie" comment, Cardona did not dispute that the results of the DNA swabbing connected him to Delacerda's stabbing.  Thus, this statement was not only improper under Austin because it characterized Cardona as a liar, it was therefore also misleading.  In addition, through this and the "Come on.  Be truthful" comment, the DPA also improperly implied his personal opinion of Cardona's credibility.  In a case with no other direct eyewitness testimony regarding the moment the stabbing occurred, Cardona's testimony was critical to his defense.

Thus, these statements by the DPA constituted prosecutorial misconduct.

### b.    The "enforcer"

In addition, the DPA's characterization of Cardona as an "enforcer" who was "not scared" was improper:

> [T]hat's how [Cardona] was on those streets.  He looked like he owned those streets, riding his bike all over, sometimes with the light on, sometimes with the light off, going up the one way, going against -- going against traffic, riding on the sidewalk, whatever, doing whatever he wants.  He's scared?  He looks like the enforcer.

---

potentiality of extreme prejudice.  143 Hawai'i at 50-56, 422 P.3d at 50-56. And since the time of Cardona's trial, we have admonished prosecutors to "scrub *lie* and its derivatives from their closing argument vocabulary." Hirata, 152 Hawai'i at 31 n.5, 520 P.3d at 229 n.5.

Cardona never testified that he was scared riding his electric bicycle on the streets of Waikīkī, where he had grown up.  Rather, Cardona testified that he was scared after Castaneda-Pena punched him, Cardona's glasses fell off, and he could not see.  Thus, the prosecutor improperly implied that Cardona's manner of riding his electric bicycle through the streets of Waikīkī meant that Cardona was not scared during the altercation.  See, e.g., Basham, 132 Hawai'i at 112, 319 P.3d at 1120 ("Whether the evidence bears a logical and proximate connection to the point the prosecutor wishes to prove is perhaps the most obvious consideration in determining whether an inference is reasonable.") (citation omitted).

Further, the prosecutor's comment that Cardona "looks like the enforcer" was improper because there was no evidence or testimony from which the DPA could reasonably infer that Cardona somehow ran the streets of Waikīkī or was otherwise acting as an "enforcer."  See, e.g., Basham, 132 Hawai'i at 112, 319 P.3d at 1120 ("It is also relevant [in determining whether an inference is reasonably inferred from the evidence] whether the prosecutor made the argument simply to enflame the passions of the jury.") (citation omitted).

### c.   Statements re Cardona's eyesight testimony

The DPA's statements about Cardona's eyesight testimony also improperly characterized him as a liar.

33

> [R]emember, there's no credible evidence that he can't see. There's no credible, independent evidence that he had an eye problem.

A defendant can testify as to his visual perception.  See, e.g., State v. Vliet, 91 Hawai'i 288, 192, 983 P.2d 189, 291 (1999) (summarizing OVUII defendant's testimony that gabapentin gives him double vision and muscle spasms in his eyes).  Cardona testified extensively about his apparent poor eyesight, discovered when he was four years old, and which deteriorates so rapidly that he needs a new glasses prescription every six months.

This court has warned prosecutors to "refrain from expressing their personal views as to a defendant's guilt or credibility of witnesses."  See State v. Marsh, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986).  The DPA's statement implied his personal views regarding Cardona's credibility.[6]

---

[6]  The DPA also improperly inserted new evidence when he stated:

> Defendant said, well, when I don't wear my glasses, I'm blurry.  He didn't say he was color blind.  Guy was wearing a red hat, black shirt, red shorts.  You take off your glasses, you get up close to somebody, maybe you might see, but you see a figure.

We have instructed that closing arguments are "not the place to introduce new evidence outside the safeguards of the Hawai'i Rules of Evidence."  Basham, 132 Hawai'i at 113, 319 P.3d at 1121.  There had been no evidence at trial introduced about whether Cardona was colorblind.  The DPA suggested that Cardona should have been able to see that his attacker had on a red hat, black shirt, and red shorts, but had not asked whether Cardona could see colors.

All of these statements by the DPA in closing argument were not benign or reasonable inferences; rather, they constituted prosecutorial misconduct.

### 3.    The prosecutorial conduct violated Cardona's right to a fair trial

As misconduct has been established, we next address the promptness or lack of a curative instruction and the strength or weakness of the evidence against Cardona to determine whether there is a reasonable possibility that the conduct might have affected the trial's outcome.  Hirata, 152 Hawai'i at 31, 520 P.3d at 229 (citation omitted).  If so, the misconduct is not harmless beyond a reasonable doubt, and vacatur of the conviction is required.

With respect to "the promptness or lack of a curative instruction," Rogan, 91 Hawai'i at 413, 984 P.2d at 1239, defense counsel did not object to the statements during the DPA's closing argument.  Therefore, there were no curative instructions.  Even if specific curative instructions had been given, however, as this court recently pointed out in Hirata, "curative instructions are not particularly effective."  152 Hawai'i at 34, 520 P.3d at 232.  This factor weighs in favor of concluding that prosecutorial misconduct prejudiced Cardona's right to a fair trial.

The last factor to consider in prosecutorial misconduct claims is "the strength or weakness of the evidence against the defendant." Rogan, 91 Hawai'i at 413, 984 P.2d at 1239. In this case, the "strength or weakness of the evidence against the defendant" hinged entirely upon Cardona's testimony, as he was the only one who testified about what happened between him and Delacerda. Thus, the defendant's credibility here was particularly important. See, e.g., State v. Williams, 149 Hawai'i 381, 393, 491 P.3d 592, 604 (2021) ("This court has expressed concerns about prosecutorial misconduct in cases where the defendant's credibility is particularly important. In Underwood, this court stated that '[t]he potential for prejudice is particularly evident where . . . the improper comments specifically concerned the credibility of the testimony on which the case turned.") (citing State v. Underwood, 142 Hawai'i 317, 329, 418 P.3d 658, 670 (2018)).

Hence, we conclude that prosecutorial misconduct prejudiced Cardona's right to a fair trial in violation of the due process clause of Article I, Section 5 of the Hawai'i Constitution. The prosecutorial misconduct in this case was not harmless beyond a reasonable doubt because there is a reasonable possibility that it affected the outcome of Cardona's trial.

C.  **In light of these instances of prosecutorial misconduct, the DPA's excessive leading questions contributed to the unfairness of Cardona's trial**

In his third question on certiorari, Cardona also asserts the ICA erred by ruling that the DPA's contumacious and repeated use of leading questions was "improper" yet "harmless beyond a reasonable doubt." We agree with the ICA in its footnote regarding the disrespectful nature of the DPA's conduct during trial: "[T]he DPA's repeated asking of leading questions, in spite of the circuit court's directions to the contrary, does not promote a positive image of the legal profession, does not assist the court and/or the jury in reviewing the case, and does not display appropriate respect for the criminal justice system." Cardona, 2024 WL 450038, at *2 n.4.

This court has previously held that, even where "no single instance of prosecutorial misconduct substantially prejudiced [defendants'] right to a fair trial," the "cumulative weight of the prosecutor's improper conduct" can be "so prejudicial as to deny [defendants] a fair trial." State v. Soares, 72 Haw. 278, 815 P.2d 428 (1991).

Other courts have held that leading questions, in addition to other prosecutorial misconduct, can cumulatively prejudice a defendant's right to a fair trial. See, e.g., Com. v. Culver, 51 A.3d 866, 881-82 (Pa. Super. 2012) (holding that it was prosecutorial misconduct for a prosecutor to ask excessive

37

leading questions despite sustained objections because the prosecutor refused to obey the repeated instructions of the trial court; further, while this conduct alone would not have prejudiced the defendant, the prosecutor's other conduct during closing arguments, coupled with this conduct, was prejudicial); Dillon v. State, 844 S.W.2d 944 (Ark. 1993) (cumulatively, leading questions insinuating that the defendant, a police officer, planted evidence on women in exchange for sex and forced sex upon multiple others, denied the defendant a fair trial).

Here, the clear instances of prosecutorial misconduct discussed above, coupled with the pervasive leading questions, cumulatively contributed to the denial of Cardona's right to a fair trial.

## D.   A Gabriel instruction was not required

In his fourth question on certiorari, Cardona argues the circuit court's failure to give a Gabriel instruction after Officers Rezentes' and Coen's identifications "allowed the jury to think Cardona was a bad person because HPD knows him, and his Waikiki routine."  At the August 17, 2022 pretrial hearing, however, defense counsel himself stated, "I don't know if [the Gabriel instruction is] even necessary."

In any event, a Gabriel instruction was not necessary. First, Rezentes did not even testify that he recognized Cardona

from a prior contact. Second, after Coen identified Cardona on direct examination, defense counsel elicited, on cross-examination, the relatively benign circumstances of Coen's prior contacts with Cardona: citations for COVID mask violations. In sum, before trial, defense counsel did not want a Gabriel instruction so as not to call attention to officers' prior contacts with Cardona. But on cross-examination, he elicited the benign nature of the prior contacts himself. In these circumstances, a Gabriel instruction was not required, contrary to what Cardona now asserts.

**E.    The circuit court properly gave the "voluntary act" instruction**

In his fifth and last question on certiorari, Cardona claims that the circuit court's "voluntary act" instruction confused the jury into thinking that "but for" Cardona's possession of the knife in question, Delacerda would not have perished. We disagree.

In this case, the ICA correctly concluded the instruction was proper because it "informed the jury of a potential defense available to Cardona." Cardona, 2024 WL 450038, at \*2. In a prosecution for murder, which is statutorily defined in HRS § 707-701.5 as "intentionally or knowingly caus[ing] the death of another person," "[a]ny voluntary act (e.g., physical abuse) or omission may satisfy the conduct element of the offense. The

death of another person, as the intentional or knowing result of the conduct, constitutes the result element of the offense." State v. Aganon, 97 Hawai'i 299, 302, 36 P.3d 1269, 1273 (2001). A person cannot be convicted of murder in the second degree if his conduct was not a voluntary act. See HRS § 702-200(1) ("In any prosecution it is a defense that the conduct alleged does not include a voluntary act . . . ."); HRS § 702-201 ("'A voluntary act' means a bodily movement performed consciously or habitually as the result of the effort or determination of the defendant.").

There was a scintilla of evidence to require giving the instruction, because Cardona testified he had held his knife out and that it was possible Delacerda had run up against it and stabbed himself. The circuit court did not err in giving the "voluntary act" jury instruction, even over the defense's objection. See Adviento, 132 Hawai'i at 137, 150, 319 P.3d at 1145, 1158 ("[T]he trial court has a duty to instruct the jury on the defense of EMED if the record reflects 'any evidence' supporting the defense, notwithstanding the defendant's trial strategy or theory of the case," because "in our judicial system, the trial courts, not the parties, have the duty and ultimate responsibility to insure that juries are properly instructed on issues of criminal liability.").

## V. Conclusion

Based on prosecutorial misconduct that violated Cardona's right to a fair trial, as explained above, we vacate the ICA's March 7, 2024 judgment on appeal, as well as the circuit court's December 13, 2022 judgment of conviction and sentence. We remand this case to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Andrew Strand, (Myles S. Breiner, Sean Fitzsimmons, and Kyle T. Dowd with him on the briefs) for petitioner | /s/ Mark E. Recktenwald<br><br>/s/ Sabrina S. McKenna<br><br>/s/ Todd W. Eddins<br><br>/s/ Lisa M. Ginoza |
| Brian R. Vincent for respondent | /s/ Vladimir P. Devens |

